The Ethridge-Atkins Corporation, hereinafter referred to as the corporation, prior to and on November 16, 1940, was engaged in the sale and servicing of automobiles and other motor vehicles in a building at the intersection of Spring and Milam Streets in the City of Shreveport, Louisiana. Protection against loss from fire was carried by the corporation with plaintiffs herein, Hardware Dealers Mutual Fire Insurance Company and Minnesota Implement Mutual Fire Insurance Company. On said date, while W.B. King, an employee of the Standard Oil Company of Louisiana, was running gasoline from a tank truck on or near the sidewalk on the Milam Street side of the building into the storage tank of the corporation, located beneath the basement floor of the building, the gasoline ignited causing damage by fire to automobiles, stock, furniture and fixtures, amounting to $1,451.90. The insurers paid the loss and took from the corporation a subrogation of its rights against the Standard Oil Company of Louisiana, arising from the fire loss, on the theory that the fire resulted from acts of negligence of its agent, King. Fortified with this subrogation, augmented, as they allege, by legal subrogation, plaintiffs instituted this suit against the Standard Oil Company of Louisiana *Page 156 
and its insurer, the Fidelity and Casualty Insurance Company of New York, to recover the amount of said loss.
To properly comprehend plaintiffs' position and their theory of negligence as regards King's acts, an understanding of the physical situation and the modus operandi in transferring gasoline into the storage tank of the corporation is necessary. The north side of the corporation's building faced Milam Street adjacent to which runs a ten foot sidewalk which declines easterly. The floor of the basement at point where the gasoline was being transferred is several feet below the sidewalk level. The storage tank is a few feet south of the north wall of the building and, as said before, is below the concrete floor. Gasoline is conducted into this tank through a line of two inch pipe described as follows:
One section, vertical to the tank, extends three or four feet above the floor, is a short distance from the wall of the building, at the top of which is affixed what is called a T joint, having three openings. Into the upper end of the joint is screwed a short section of pipe, probably eight or ten inches long, which is closed by a cap referred to throughout the testimony as "A". We shall likewise refer to it. From the third or side opening in this joint, runs a line of pipe through the wall and beneath the sidewalk to near the north edge thereof to the end of which is connected a short perpendicular section which comes to the sidewalk's surface. This opening is referred to as the intake. In the line leading into the wall about one foot from "A", is located a valve whose function is to stop the flow of gasoline both ways. Above the point "A" there is a large transparent glass window in the building's wall. Its base adjoins the walk. This window admits clear view from the south portion of the sidewalk into the basement where are located the pipes above described.
The storage tank of Ethridge-Atkins Corporation has a capacity of five hundred gallons. During the morning of November 16, 1940, one of its colored employees reported to Mr. J.E. Bynum, its Parts Manager, whose duty it was also to order, receive and pay for gasoline needed by his company, that the tank was empty. He immediately placed an order with the local bulk station agent of the Standard Oil Company of Louisiana for two hundred gallons of gasoline. The employee, King, was instructed to deliver the needed gasoline. The tank on the truck he used for the purpose has three compartments containing, respectively, 104 1/2, 101 and 100 1/2 gallons. King had delivered gasoline in this tank to the corporation on previous occasions. The course invariably followed by him was to spot his tank at or near the intake and then notify Mr. Bynum that he was ready to deliver the gasoline. Mr. Bynum would then call one of the colored helpers and instruct him to assist Mr. King in the transfer. The boy would go into the basement, open the valve in the line above referred to and then inform Mr. King that all was ready. King would then remove the cap from the intake, insert the nozzle of the hose of his tank therein and release the gasoline. After the desired quantity had run King informed the colored boy who then would close the valve, go outside and check the quantity of gasoline that had gone into the tank; this done, he would report to Mr. Bynum and upon this report payment would be made to King.
When King arrived with gas the day of the fire, in keeping with established practice, he contacted Mr. Bynum and informed him that he had 205 gallons (two full compartments) of gasoline and inquired if the storage tank would accommodate it. Naturally, Mr. Bynum thinking the tank empty, assured him that it would. Neither of the negro boys who formerly were delegated by Mr. Bynum to look after transfer of the gas was available. Mr. Bynum then accompanied King to the truck to satisfy himself that the tank contained the quantity of gas Mr. King had represented. Satisfying himself on this score, he and King turned their attention to the basement. They discussed whether the cap "A" should be removed. Bynum told King that he felt sure it should as he recalled having seen it taken off by other delivery men at time of deliveries. He told King it was all right to remove it and he did so. King thought that perhaps the opening served as a vent but was not certain about it. After he removed the cap and ascertained that the valve was open, he came from the basement to his truck and placed the nozzle of the hose in the intake above referred to. Mr. Bynum was near by. King suggested to him that he watch through the window to see if the gas was going through; that is, that none was coming out at point "A". Bynum assured him *Page 157 
that all was well and after the lapse of about two minutes, left the scene. The contents of one of the compartments were transferred but before the other was emptied the gas, unknown to King, began to overflow through "A" and soon spread so near to an open burning gas heater on the floor of the basement, thirty-five feet away, to explode and the fire resulted.
The negligence accredited to the Standard Oil Company is set out in Articles 22 and 23 of the petition. They read:
"That the Standard Oil Company of Louisiana was negligent in allowing and permitting its employee referred to hereinabove, believed to be John King, to handle such a highly inflammable product and dangerous instrumentality as gasoline without being familiar with the handling of such, and that it was further negligent in permitting said employee to attempt the delivery of the said gasoline to Ethridge-Atkins Corporation when he was totally unfamiliar with the storage tank facilities of Ethridge-Atkins Corporation.
"That the Standard Oil Company of Louisiana was further negligent thru its employee and servant, believed to be John King, in directing the flow of gasoline into the line leading to the storage tank, at a time when an opening existed in the said line to the knowledge of the said employee; that it was foreseeable and to be expected that gasoline would or might escape from the said opening and that the said employee was further negligent in not constantly observing the opening to make certain that none of the gasoline would escape at the said opening created by the removal of the lock cap at the T joint inside the building."
Defendants deny that any negligence attaches to King, as agent of the Standard Oil Company, in delivering the gasoline; but, on the contrary, aver that in removing the cap from the pipe he followed the instructions of Bynum, the agent of the Ethridge-Atkins Corporation in every respect. In the alternative, the concurring negligence of Bynum in directing and instructing King as aforesaid is pleaded in bar of recovery.
Plaintiffs' demand was rejected and their suit dismissed. They appealed.
Plaintiffs' charge that King was an incompetent and inexperienced gasoline delivery man is not supported by the record. He had followed this line of work for the Standard Oil Company of Louisiana for over twenty years prior to the accident. However, his activities were confined almost exclusively to the country where deliveries are made to filling stations by transfer of gasoline from tanktruck directly into storage tanks outside of the station. He knew the function of the valve in the line near "A" and also knew that a vent was necessary to safely and successfully run gasoline through a line into a storage tank. With this knowledge augmented by Mr. Bynum's suggestion and information concerning removal of the cap, can it be reasonably said that King acted imprudently or negligently by removing the cap? We think not. He sought Bynum's advice and followed it. His course in this respect proves that he was, prior to that time, unacquainted with the interior arrangement of the facilities for transferring gasoline, and that theretofore the corporation's employees had looked after that phase of deliveries.
No explanation is offered as to why the gasoline ran out of the pipe. The logical presumption is that Bynum was in error about the storage tank being empty. The mechanical pump evidently was out of order and when it failed to lift gasoline, naturally, it was concluded that none was in the tank. Whether the tank was full, causing the overflow, could have been and probably was definitely ascertained by measurement after the fire. It is done by putting a measuring stick in the opening "A" and allowing it to descend to the bottom of the tank. The depth of gasoline is registered on the stick from which the gallonage therein is computed.
Under the circumstances King violated no duty in not ascertaining the quantity of gasoline in the storage tank. This rule was invariably followed when the tank was reported to him as being empty and the quantity of gasoline in his tank truck was less than the capacity of the tank. Bynum testified that his rule was not to order gasoline until the storage tank was empty.
If Mr. Bynum had removed the cap himself instead of King, under the mentioned circumstances, could the corporation have held the Standard Oil Company responsible for the results of the fire? Surely not. Now, in view of the invariable practice of the corporation's servants attending to matters in the basement, when King presented gasoline for delivery, is the situation from a legal standpoint, different? We say not. If Bynum had not felt that it was his company's *Page 158 
duty to look after arranging the valves, pipes, etc., on the inside for reception of gasoline he certainly would not have been in the basement giving advice and offering suggestions to King. Surely, under the circumstances, King had ample warrant in following Bynum's advice. In a manner, King was acting on behalf of the corporation when he removed the cap.
It is alleged and argued that it was negligence for King to leave open the pipe at "A" without keeping it under constant observation, after Bynum had ceased to do so, because he should have known, and it is foreseeable, that gasoline could escape therefrom. It seems to us, all things considered, that King exercised the degree of care and precaution demanded by the facts of the situation. He suggested to Bynum, the corporation's agent, to watch the opening from the time the gasoline began to pass through the pipe, and he did so for awhile. Bynum was satisfied from his watch that what had been done was all right, and he walked away. Surely nothing was reflected from the situation to motivate King to leave his own truck and resume watching where Bynum left off. It was his duty while the gasoline was flowing to remain by his truck so as to be in a position to instantly shut off the flow if anything happened to make such action necessary. This is proven from his action as soon as he saw the flashes from the explosion. He instantly cut off the gasoline flow and drove the truck to a place of safety.
It is shown by the testimony of two other delivery men that when they brought gas to the corporation's place of business, at its request, they went inside and measured the tank's contents, then opened the valve and proceeded to run the gas. This testimony is pointed to as reflecting the custom prevailing as regards deliveries. It is perceivable that different delivery men could have different methods of making deliveries to the same customer. It is certain King and the corporation did not follow the methods of these other men. The fact that this was not done, we think, should not create any unfavorable inference against King or his employer.
Whatever else may be said on the subject, it is clear that Bynum actively supervised the transfer of the gasoline. It was done in a manner suggested by him and pursuant to his direction. If King's action amounted to negligence, most certainly Bynum was a party thereto and their negligence being concurrent, no action accrued in favor of his employer to recover as against King's employer.
For the reasons herein assigned, the judgment appealed from is affirmed, with costs.